Filed 7/9/21  Marin v. Interinsurance Exchange etc. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MICHELLE PAOLA MARIN et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>INTERINSURANCE EXCHANGE OF THE AUTO CLUB,<br><br>Defendant and Respondent. | B294361<br><br>(Los Angeles County Super. Ct. No. BC599460) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mel Recana, Judge.  Affirmed.

The Yarnall Firm and Delores A. Yarnall; Algorri Firm, Mark S. Algorri, Bruce Palumbo and Samuel Ogbogu for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, John T. Brooks, Karin Dougan Vogel, Thomas R. Proctor and Matthew G. Halgren for Defendant and Respondent.

Shernoff Bidart Echeverria, Ricardo Echeverria, Steven Schuetze and Kristin Hobbs for Amicus Curiae of the Consumer Attorneys of California.

_____

In this bad faith action arising out of a horrific automobile accident, the insured's liability was clear, and the claimant was injured so severely that a conservator was appointed to represent her interests. The insurer offered a policy limits settlement. The claim failed to settle not because of any issues regarding the settlement amount, but because the conservator required a declaration from the insured sufficient to convince the Probate Court there were no other sources of recovery. Ultimately, the injured party's counsel sent a demand letter, the interpretation of which was a key issue of dispute at trial. The claimant took the position that, after months of no progress in obtaining the declaration, her demand letter required production of the declaration by a date certain – a deadline the insurer failed to meet. The insurer took the position that the demand letter sought only a promise to provide the declaration – a requirement with which the insurer eagerly agreed, as, in fact, the declaration was in progress and nearly complete. The jury sided with the insurer, and the claimant appeals.

On appeal, although the claimant challenges a number of the jury instructions given, both parties also argue they are entitled to judgment as a matter of law on the basis that their interpretation of the demand letter is necessarily correct. We conclude that the insurer's interpretation of the letter is correct as a matter of law – the letter did not require the submission of the declaration by a specified date in order to manifest assent to the settlement agreement. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Although resolution of the appeal turns on the interpretation of a single letter, the history of the claims-handling process leading up to the letter gives context to our analysis.

## The Relevant Facts

**1.     *The Accident***

The case arose from an automobile accident on November 27, 2011, involving Maryann Ganuelas and Michelle Marin.

Marin was seriously injured.  She was rendered comatose as a result of the accident and ultimately remained in a vegetative state.

Ganuelas, who was 18 years old at the time of the accident, was an additional insured on her father's policy with defendant and respondent Interinsurance Exchange of the Automobile Club (AAA).  The policy had a bodily injury limit of $100,000 per person.

Attorney Ademola Okusanya is Ganuelas's uncle.  The day after the accident, he wrote AAA, advising AAA that he had been retained "to represent [her] interests in the settlement" of the claim.  He requested that all inquiries regarding the claim be directed to his office.

**2.     *AAA Begins Adjusting the Claim***

Once Attorney Okusanya made contact, AAA sought to take Ganuelas's statement.  Attorney Okusanya promised to make her available once she completed her school exams.

Ganuelas provided a statement to AAA adjuster Justin Velasco on January 6, 2012, approximately six weeks after the accident.  AAA determined Ganuelas was 80 percent at fault.

Neither Velasco nor his supervisor had authority to offer the policy limits of $100,000, so a request was sent up the chain of command.  On January 23, 2012, Velasco was granted approval to offer $100,000 in exchange for a release of Ganuelas and her father.  Along with the authority came a directive to

"[c]oordinate any declarations, excess insurance, or asset requests with the insured's atty."

### 3. *In January, Marin Was Not Yet Prepared to Accept the Offer*

AAA had been speaking with Marin's father. On December 29, 2011, he identified the firm of Aspell and Lopez ("A&L firm") as Marin's counsel on the claim.[1]

On January 23, 2012, within a half hour of receiving approval to settle the claim for $100,000, Velasco telephoned the A&L firm to discuss settlement and left a message. On January 25, 2012, Patrick Aspell of the A&L firm returned his call and advised that the $100,000 policy limit offer "will most likely be accepted, but [the firm] will have to petition the court since [Marin] can't give consent." (Capitalization omitted.) The following week, the A&L firm informed AAA that it was trying to establish a conservatorship for Marin.

Over the next few months, Velasco continued to contact the A&L firm regarding the status of the conservatorship. On July 25, 2012, the A&L firm informed Velasco that the conservatorship was granted and they were now working on the settlement. Alejandra Romero, Marin's sister, had been appointed conservator.

Attorney John Streeter worked in the same building as the A&L firm, but did not work for the firm. After her appointment

---

[1] At various time in the course of the claim, Marin would be represented by three separate sets of attorneys: (1) two attorneys at the Aspell and Lopez firm; (2) Attorney John Streeter, who was subsequently associated by Aspell and Lopez; and (3) Attorney Maryam Parman, who replaced all prior attorneys. We refer to Aspell and Lopez and its attorneys (but not Streeter) collectively as the "A&L firm."

4

as conservator, Romero signed a letter formally designating both the A&L firm and Attorney Streeter to handle the claim. From that point forward, Attorney Streeter took over the claim negotiation for Marin.

### 4. *AAA Reaffirms Its Offer and Sends a Draft Release*

On July 26, 2012, Attorney Streeter wrote Velasco at AAA, forwarding the Letters of Conservatorship and a copy of the conservator's designation of counsel. His cover letter also requested information he believed necessary for court approval of the settlement.

There is some dispute in the record as to whether the cover letter was actually sent; Velasco and his supervisor testified that the attachments were received with no cover letter. We need not resolve whether the cover letter was omitted. Velasco said he did not receive it and that would explain Velasco's response, which we discuss next before we consider the specific information Attorney Streeter's letter requested.

Velasco had offered AAA's policy limits of $100,000 as early as January; he had been told it would likely be accepted, but the case was in a holding pattern until a conservatorship could be established. On August 1, 2012, once he received the letters of conservatorship, Velasco sent Attorney Streeter a letter stating, "Pursuant to our settlement agreement, enclosed is our release in the amount of $100,000.00 in full settlement of the claim. [¶] Please have your client sign where indicated and return the release to us. Upon receipt of the properly executed release, we will forward our settlement check." A one-page release was included.

**5.** ***In Late July, Marin, Through Attorney Streeter, Requests Information***

Attorney Streeter apparently was not quite ready to effect the settlement. Streeter's cover letter of July 26 – the one that Velasco said he had not received – requested information Streeter believed necessary to complete the settlement. The letter was phrased only as a request for information; it made no explicit reference to AAA's offer, nor did it indicate that settlement was conditioned on the nature of the information provided.

The letter stated: "Now that the formalities have been satisfied, I would like to inquire as to your, and your client's willingness to provide certain items that will be required, at a minimum, at the ultimate hearing seeking approval of any settlement. [¶] I anticipate needing a certified copy of the declarations page of the policy, as well as the entirety of the policy itself, and a declaration, under penalty of perjury, relative to no additional insurance, excess or otherwise. Additionally, we would require, also by way of a declaration, a financial statement, and information that at the time of the incident, that your insured was not in the course and scope of her employment, or performing a task or errand for another. [¶] To satisfy an inquiry relative to negligent entrustment, we would need information relative to how the vehicle was obtained by her, as well as any pre-acquisition driving issues. [¶] I can appreciate that these are of course, not typical requests, but since we are dealing with an individual in a permanent vegetative state, it is a necessity. [¶] If you have any initial questions, just send me an email to to [sic] expedite the process."

AAA has a standard form declaration which it can use to have its insureds confirm, via checkbox, that they were not acting in the course of their employment and did not have excess

6

insurance. The information Attorney Streeter sought was substantially more detailed. Velasco's supervisor testified he had never before been asked to provide some of the information Attorney Streeter had requested for an insured's declaration.

Although this request was unusual, AAA did not claim that it was unreasonable. AAA did not immediately comply, however, because it had no record of having received the cover letter.

6. *In August, Marin, Through Attorney Streeter, Repeats the Request*

Having not received any of the requested information, on August 29, 2012, Attorney Streeter sent a second, stronger letter. At trial, he described the second effort as a "polite demand letter."

The letter stated: "There seems to be some confusion in the scope of our demand to settle this case. [¶] . . . [¶] From your insured, we require a Declaration, under penalty of perjury: that there is no other available insurance; that she was not in the course and scope of employment or engaged in any errand or performing a task for another; a financial statement; and, information on the manner in which she acquired her vehicle. [¶] I expect to be provided with this information within 30 days."

7. *Through September and October, AAA and Ganuelas Provide the Information for the Declaration*

Upon receiving Attorney Streeter's August 29 letter, Velasco called him to discuss the details of what he needed. Velasco had some of the information from when he had taken Ganuelas's statement in January 2012. He gave Attorney Streeter that information immediately on the phone.

Then, Velasco contacted Attorney Okusanya's office, as Attorney Okusanya was representing Ganuelas. There, he spoke with Jessica Wasef, a paralegal. Velasco explained to Wasef the

7

detailed declaration Attorney Streeter needed from Ganuelas. Wasef said she would coordinate the declaration with Attorney Streeter.

What followed was a cooperative effort among Velasco (for AAA), Attorney Okusanya and paralegal Wasef (for Ganuelas), and Attorney Streeter (for Marin) to obtain the necessary declaration from Ganuelas. On September 10, Attorney Streeter sent Velasco a draft declaration with spaces to be filled in.[2] His letter explained, "I would appreciate it if you could discuss it with your insured and make the necessary corrections and additions where indicated. I will then finalize it and return to you for her execution." Upon receipt, Velasco forwarded the draft (and cover letter) to Wasef.

On September 24, Wasef emailed the draft declaration to Ganuelas, so that she could provide the necessary information.[3] On October 5, Wasef called Ganuelas and left a voice mail, checking "on the status of her completing her declaration." On October 24, Attorney Okusanya faxed (and mailed) to Attorney Streeter Ganuelas's answers for insertion into the final

---

[2] For example, item 3 of the declaration stated, "I (purchased the vehicle in _____ with my own funds.) [¶] I (was given the vehicle by____). At the time the vehicle was given to me, I had (number of moving violations and automobile accidents.)"

[3] The record shows a two-week delay between the date Attorney Streeter sent his letter to Velasco (September 10) and the date Wasef e-mailed it to Ganuelas (September 24). Some of the delay is attributable to transit time for the letter to be mailed from Attorney Streeter to Velasco and onward to Wasef; the rest is unexplained.

declaration.[4]  Okusanya's letter explained, "Kindly send our office a finalized copy of the amended declaration for our client to review and endorse."[5]

### 8. *Attorney Parman Replaces Attorney Streeter and the A&L Firm*

While Velasco, Attorney Okusanya, and Attorney Streeter were cooperating on obtaining the declaration from Ganuelas, Marin's conservator decided to replace Attorney Streeter with new counsel, Attorney Parman.

---

[4]     Attorney Okusanya wrote a letter, not a draft declaration. For example, as to item 3, quoted in footnote 2 above, he wrote, "This inquiry is vague and ambiguous.  However, client responds as follows:  '*I was given the vehicle by Roy Ganuelas.  At the time the vehicle was given to me, I did not have any moving violations. I was involved in one no fault accident caused by another driver.*"

[5]     Attorney Streeter's August 29 letter had stated that he "expect[ed] to be provided with this information within 30 days." Velasco had conveyed that "expectation" to paralegal Wasef. Wasef's notes confirm that Velasco told her that Attorney Streeter "need[ed] to know" the information "within 30 days." Wasef interpreted that to mean "he needed the information as opposed to . . . a hard and fast deadline."  The 30-day time period was not met.  Velasco testified that, at one point, Attorney Streeter told him that he was fine with how smoothly things were going, so the 30-day limit was no longer necessary.  Attorney Streeter testified he never agreed to waive the 30 days and Velasco had never asked him to do so.  Whether AAA blew the deadline by not better impressing Wasef and Ganuelas with the urgency of the matter is not at issue.  Attorney Parman's replacement of Attorney Streeter would render moot Attorney Streeter's deadline, as Parman presented a new demand with a new date.

There was some disagreement as to exactly when Attorney Parman took over from Attorney Streeter. On September 17, 2012, Attorney Parman sent Velasco a form letter indicating that she had been retained by Marin and would contact Velasco when her investigation was complete. Velasco immediately phoned Attorney Parman and indicated his understanding that Attorney Streeter was representing Marin. According to Velasco, his perception was that Attorney Parman had not known there was already an attorney on the case. Velasco believed Attorney Parman would either work together with Attorney Streeter or the two attorneys would figure out which one would handle the representation.

On September 24, Velasco spoke with Attorney Streeter, who, according to Velasco, "was adamant that he was the attorney" of record for the conservatorship, and this could not be changed without his consent. He told Velasco he would coordinate with Attorney Parman. In the meantime, Attorney Streeter continued to work with Attorney Okusanya's office to gather the information for Ganuelas's declaration. On the same day Velasco spoke to Streeter, Wasef emailed the initial draft declaration to Ganuelas for her to complete her answers.

As earlier mentioned, Attorney Streeter was associated as counsel for Marin by the A&L firm, and worked in the same building. But he was not a member or associate of A&L. On September 27, Patrick Aspell of the A&L firm wrote AAA, advising that the firm was no longer on the case. Although Attorney Streeter testified that he drafted the letter for Aspell's signature, the letter did not state that Attorney Streeter himself was off the case. Attorney Streeter believed that he was not replaced as counsel until October 9, 2012, when he was substituted out of the conservatorship action. According to

10

Velasco, Attorney Streeter did not inform Velasco that he was no longer attorney of record until mid-November.

When Attorney Okusanya faxed the information for Ganuelas's declaration to Attorney Streeter on October 24, Okusanya did not know that Attorney Streeter was no longer representing the conservator.

Attorney Streeter transmitted his file to Attorney Parman around October 29, 2012. Attorney Parman's firm uploaded the information into their system on that date, and Attorney Parman reviewed the uploaded file. The materials Attorney Parman received included the October 24 fax from Attorney Okusanya containing the information for Ganuelas's declaration. Attorney Parman believed the letter contained the information Attorney Streeter had sought, but admitted "I didn't read it that carefully, but I did read the first couple of paragraphs."

## 9. *Attorney Parman Sends the October 31 Letter*

After three months of back-and-forth letters and emails, the participation of a troupe of insurance representatives, lawyers and other interested parties, and a month past the 30 days by which Streeter wrote he "expect[ed]" the information he had requested, we finally come to what is the critical document in this case – Attorney Parman's letter of October 31. In its entirety, the letter reads:

"As you are aware the above referenced incident caused Ms. Marin serious injuries, as a result she remains in a fully comatose state. We firmly believe you've had plenty of time to properly evaluate this claim. We are therefore, requesting settlement in the amount of your insured's policy limits and disclosure of your insured's policy limits. This settlement offer is conditional upon:

11

"1. Your furnishing us with a certified copy of the complete insurance policy, including declarations.

"2. A prompt exchange of the settlement draft upon approval of the Petition to Approve Compromise of Disputed Claim for a Person with Disability for a fully executed release and settlement documents releasing your insured, driver, company and their respective agents, assigns, successors, affiliates, associates, heirs, executors, administrators and no other persons and parties.

"3. Settlement draft is to be issued according to the court approved Settlement of a Person with Disability.

"4. A declaration signed by your insured regarding additional insurance coverage and agency.

"We are certain that you are aware that if a judgment in excess of your insured's policy limit is entered against him in Ms. Marin's lawsuit, when you have had the opportunity to settle this matter within your policy limits, your company may be held responsible for the difference and/or for bad faith. *Silberg v. California Life Ins. Co.,* 11Cal.3d 452, 113 CR 711 (1974). We anticipate your evaluation of our client's settlement demand in light of this factor.

"We have enclosed herewith or have already supplied you with copies of billing statements and information necessary for evaluating this claim. We, therefore, believe that you are in a position to act promptly upon this demand. Accordingly, this offer shall remain open until 5:00 p.m. on **November 8, 2012**."

"Your prompt attention to this matter will be appreciated. If you have any questions, please feel free to contact our office."

Attorney Parman admitted at trial that the letter was partly from a template and partly specific to this case. She did

12

not personally sign the letter, nor did she mail it – someone else in her office did so.

### 10. *Velasco Makes Efforts to Accept*

Although dated October 31, AAA did not receive the letter until November 6, 2012, leaving Velasco only two days to respond. Velasco immediately mailed Attorney Parman a letter disclosing the $100,000 policy limits and confirming that AAA was tendering it.[6] He also called and "left a message to say we're accepting your demand, we're tendering our policy limits of $100,000, and we're fine with everything. We just wanted to clarify some of the administrative steps, the bullet points." Specifically, Velasco believed that Attorney Parman already had a declaration sheet and certified copy of the policy, as he had sent them to Attorney Streeter. He also thought she might have "the declaration form ready," and wanted to clarify if Attorney Parman was satisfied with the declaration in the form he and Attorney Okusanya had been finalizing with Attorney Streeter or if there was something different she needed. Velasco had ordered another certified copy of the policy, and, in the message to Attorney Parman, he stated the copy would be sent soon.

Attorney Parman did not return Velasco's call. Attorney Parman sometimes saves voice mail messages, but did not save any messages from Velasco on this date. However, Attorney Parman did not deny that Velasco left a message on that date; she testified that she had no recollection one way or the other.

---

[6] The letter stated, "This is to confirm we are offering our policy limit of $100,000 to resolve your client's claim."

**11.**   ***Attorney Parman Takes the Position the Offer Had Expired or was Rejected and Declines to Negotiate Further***

On November 12, 2012, Velasco called again and left another voice mail message. He stated that AAA had just sent a certified copy of the policy and requested a callback "with regards to some of the other items listed on your letter." Attorney Parman received this voice mail but did not respond.

On November 15, 2012, Attorney Parman faxed a letter to Velasco, asserting that her "policy limit demand expired on November 8, 2012" and claiming that AAA "failed to unconditionally and timely tender the policy to protect your insured against excess judgment."[7] Attorney Parman classified this as bad faith. She said she would no longer accept the policy limit in settlement, and "instructed" Velasco to notify Ganuelas "that you have failed to timely and unconditionally tender the policy limit to resolve a substantial injury claim placing her in great peril." Attorney Parman's letter added, "So that there are no misunderstandings, we would like to remind you of the facts and circumstances surrounding this claim. Our office forwarded a policy limit demand on behalf of Michelle Marin on October 31, 2012 with an expiration date of November 8, 2012. Since it has been almost one year since the loss, you should have been well aware of the seriousness of this accident my client's injuries and in a position to respond quickly to our demand. Our letter demanded settlement for policy limit with four simple conditions.

---

[7]    This language is curious. Velasco's letter of November 6 had, in fact, "unconditionally and timely tender[ed] the policy." Attorney Parman would later claim that the issue was not that AAA failed to unconditionally tender the policy, but that the tender purportedly failed to comply with her conditions.

[AAA] failed to timely address the demand and our conditions.  In fact, to date you have not met any of the conditions in our policy limit demand."

12. *Velasco Obtains a Finalized Declaration; Attorney Parman Refuses Further Entreaties*

Upon receiving Attorney Parman's November 15 fax, Velasco called Attorney Parman, explaining that everything had been tendered.  He asked if she wanted the declaration they had been working on with Attorney Streeter or something else.  Attorney Parman was not interested in receiving anything; she was unwilling to resolve the claim at this time.  She claimed that all four conditions in her letter had to have been completed by November 8 in order for AAA to have effectively accepted.  Velasco asked to set a reasonable schedule to complete the settlement; Attorney Parman refused.

The same day, Velasco called Wasef, the paralegal in the office of Attorney Okusanya.  (We observe again that Okusanya was Ganuelas's uncle.)  Wasef called back on November 19.  On the phone, Velasco told Wasef that Attorney Parman was claiming bad faith.  Nonetheless, Velasco continued to complete the declaration.  Wasef faxed Velasco a copy of the October 24 letter Attorney Okusanya had sent to Attorney Streeter with the information for Ganuelas's declaration.  Velasco immediately forwarded it to Attorney Parman, who did not respond.  On November 21, Velasco called Attorney Okusanya's office and asked if Ganuelas could sign a draft containing the language from the October 24 letter and send it to Attorney Parman as

15

soon as possible.  Ganuelas's declaration was signed and sent within two days.[8]  Attorney Parman did not accept it.

## Marin and Ganuelas's Bad Faith Lawsuit

### 1.    *The Underlying Action and Partial Assignment*

On March 25, 2013, Marin, through her conservator, brought suit against Ganuelas.  AAA defended the action.  It resulted in a judgment in favor of Marin which, inclusive of costs and postjudgment interest, exceeded $23 million.

Ganuelas then partially assigned her bad faith claim to Marin in exchange for a stay of execution and joint prosecution agreement.  She retained the portion of her bad faith claim for any emotional distress damages she may have incurred.

### 2.    *The Complaint in the Present Action*

On October 29, 2015, Marin (through her conservator) and Ganuelas (collectively, plaintiffs) brought suit against AAA for insurance bad faith.  They alleged liability based on AAA's failure to settle the case at policy limits when it had an opportunity to do so.  They specifically alleged that Attorney Parman's October 31, 2012 demand letter required that AAA "at the time of acceptance, provide a declaration signed by Ganuelas regarding additional insurance and agency."  Plaintiffs' complaint continued: "Despite months of requests for receipt of the necessary documentation, which AAA never denied was necessary to effectuate settlement at applicable policy limits, AAA failed to meet the reasonable and essential conditions necessary to effectuate settlement by continuing to fail to provide the necessary documentation.  Thus,

---

[8]    Ganuelas dated her signature on the declaration November 22.  Attorney Okusanya's letter transmitting it is dated November 21.  Wasef testified that her notes showed it was e-mailed on November 23.

16

AAA failed and refused to meet Parman's reasonable settlement demand of applicable policy limits on behalf of Marin."

3.     *Trial*

The trial proceeded before a jury.  Plaintiffs' theory of the case was that Marin had made "three demands for policy limits.  Not one was accepted per the terms."  The jury was asked to determine whether the three letters – Attorney Streeter's July 26 and August 29 letters, and Attorney Parman's October 31 letter – constituted reasonable settlement demands and whether AAA failed to accept them.  The sole basis for plaintiffs' argument that AAA did not timely accept the settlement offer was AAA's failure to timely provide Ganuelas's declaration.  Marin's counsel argued to the jury:  "This case was clearly about [AAA]'s inability to secure a simple piece of paper, a simple signed declaration for over ten months, a simple signed piece of paper that would have saved the day."  Ganuelas's counsel agreed, arguing, "I have one question:  Why did it take so long to get a simple declaration that everybody knew from Day One would be needed to get this case settled and to protect my client, Maryann Ganuelas?"  He added, "The only thing that stopped this case from settling was Maryann Ganuelas' declaration, . . . ." [9]

---

[9]     On appeal, plaintiffs argue that, in addition to AAA's failure to comply with Attorney Parman's demand by failing to timely transmit Ganuelas's declaration, AAA failed to comply with Attorney Parman's letter with respect to a release, because the release AAA had previously sent Attorney Streeter was overbroad.  This argument was not pursued at trial; the sole theory at trial was that AAA failed to meet Attorney Parman's deadline regarding a declaration.  As plaintiffs did not argue that AAA's acceptance was invalid in any other way at trial, the "release" argument is waived on appeal.  (*Steele v. Totah* (1986) 180 Cal.App.3d 545, 551-552.)

AAA took the position that its performance, under all the circumstances, was reasonable. Specifically, as to Attorney Parman's October 31 letter, the parties agreed that it was for the jury to decide whether the letter required that AAA provide Ganuelas's declaration by November 8, or if, in the alternative, the demand could be accepted simply by words of acceptance. Witnesses gave opposing opinions on the issue. There was never any question as to AAA's *intent*; indeed, plaintiffs' expert conceded that the AAA "professionals handling this claim wanted and were trying to get the claim settled." Plaintiffs argued that AAA simply failed to get it done.

The jury found by special verdict neither of Attorney Streeter's letters constituted a reasonable settlement demand, but Attorney Parman's October 31 letter did. The verdict also reflected the jury's finding that AAA did not "fail to accept" Attorney Parman's October 31 letter.

Judgment was entered in favor of AAA. Plaintiffs' motions for new trial and judgment notwithstanding the verdict were denied. Plaintiffs filed a timely notice of appeal.

## *DISCUSSION*

On appeal, plaintiffs raise a number of challenges to the jury instructions given by the trial court. Plaintiffs also argue that, as a matter of law, they are entitled to partial judgment in their favor on the issue of liability. Specifically, although they had previously argued that it was for the jury to decide whether Attorney Parman's October 31 letter required presentation of Ganuelas's declaration by November 8, they take the position on appeal that, as a matter of law, the letter required that AAA provide the declaration by November 8. Plaintiffs argue, for example, "Parman's 10/31/2012 demand, read in context, where AAA knew that Marin had long requested AAA to deliver

18

documents, could only be interpreted to be a unilateral offer, requiring AAA to act in order to 'accept'." As the jury found the letter to be a reasonable settlement demand, plaintiffs argue the jury must have also found that the November 8 declaration-deadline was reasonable, entitling plaintiffs to judgment on liability. Plaintiffs' argument on this point continues: "Bad faith is shown here as a matter of law." They contend "no properly instructed jury could have found AAA timely 'accepted' Marin's conditional demand for delivery of documents. [¶] JNOV lies on liability. [¶] Thus, this Court should order a partial new trial on Ganuelas's emotional distress and punitive damages only. [Citations.] Marin's damages, (the underlying PI judgment, plus interest as accrued), are set as a matter of law. [Citation.]"

Legally, AAA agrees with plaintiffs that the interpretation of the October 31, 2012 demand is a question of law. Not surprisingly, AAA takes the opposite interpretive position, arguing that "no reasonable jury could have concluded that [AAA] did not accept the October 31 demand, . . . because the demand did not require the requested declaration to be delivered by November 8."

We agree that the interpretation of the October 31 letter is a question for the court. Because we also agree with AAA that as a matter of law Attorney Parman's October 31 letter did not require delivery of Ganuelas's declaration by November 8, we affirm the judgment for AAA, without addressing the other issues raised by the parties.

1.  *Overview of Bad Faith Law*

"From the covenant of good faith and fair dealing implied by law in all contracts, and from the liability insurer's duty to defend and indemnify covered claims, California courts have derived an implied duty on the part of the insurer to accept

19

reasonable settlement demands on such claims within the policy limits.  [Citation.]  '[A]n insurer is required to act in good faith in dealing with its insured.  Thus, in deciding whether or not to settle a claim, the insurer must take into account the interests of the insured, and when there is a great risk of recovery beyond the policy limits, a good faith consideration of the insured's interests may require the insurer to settle the claim within the policy limits.  An unreasonable refusal to settle may subject the insurer to liability for the entire amount of the judgment rendered against the insured, including any portion in excess of the policy limits.  [Citation.]' [Citation.]"  (*Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718, 724-725.)

In early cases holding the insurer liable for bad faith, the insurer had made a conscious decision to reject the reasonable settlement offer.  (E.g., *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [insurer refused the settlement offer within policy limits because it believed the accident was not covered]; *Davy v. Public Nat'l Ins. Co.* (1960) 181 Cal.App.2d 387, 399 [insurer refused the settlement offer within policy limits because it believed the case was defensible on contributory negligence]; *Brown v. Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679, 681-682 [insurer rejected policy limits offer on the basis that unless it could save some money on the settlement, it had no reason to settle].)

Later cases established that bad faith could be established with something less than a conscious rejection of a reasonable settlement offer.  In fact, there need not be an offer at all.  For example, in *Boicourt v. Amex Assurance Co.* (2000) 78 Cal.App.4th 1390, 1392, the insurer had a practice of refusing to contact its insureds to obtain permission to disclose policy limits, which had the effect of discouraging claimants from

making offers.  The appellate court found that this practice alone could constitute bad faith, when the failure to disclose policy limits prevented the claimant from even making an offer.  (*Id.* at p. 1399.)

Other cases have held that an insurer can commit bad faith if it rejects reasonable terms of a settlement demand, even when it agrees to the settlement amount.  In *Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508 (*Barickman*), the insurer agreed to a policy limits settlement arising out of a drunk-driving accident.  However, when the injured claimant sought to modify the insurer's standard release to confirm that it would not release the convicted insured's obligation to pay court-ordered restitution, the insurer balked, ultimately scuttling the settlement.  (*Id.* at pp. 512-514.)  This was sufficient to establish bad faith.  Regardless of the insurer's good faith in agreeing to settle for policy limits, it nonetheless acted unreasonably by refusing the reasonable modification to its proffered release.[10] (*Id.* at pp. 521-522.)

---

[10]  On appeal, plaintiffs cite to *Barickman* for the proposition that an insurer "has a duty reasonably [to] do 'all within [its] power' to *effect* settlement."  The complete quote from *Barickman* is that, although the insurer had initially acted in good faith by offering policy limits "there were disputed facts, including significant issues of credibility, as to whether [the insurer] did all within its power to effect a settlement once [the victims] accepted the offer but proposed a slightly modified version of the accompanying release."  (*Barickman, supra,* 2 Cal.App.5th at pp. 520-521.)  *Barickman* did not impose a blanket duty on an insurer to generally do all within its power to effect settlement.  It held only that, even when an insurer has acted in good faith by offering policy limits, the insurer's duty was not fully discharged and it continued to have a responsibility to make reasonable

The ultimate issue for bad faith liability is whether the insurer's conduct was unreasonable under all of the circumstances. (*Barickman, supra,* 2 Cal.App.5th at p. 520.) "The standard of good faith and fairness examines the reasonableness of the insurer's conduct, and [a] mere error[] by an insurer in discharging its obligations to its insured ' "does not necessarily make the insurer liable in tort for violating the covenant of good faith and fair dealing; to be liable in tort, the insurer's conduct must also have been *unreasonable.* [Citations.]" ' [Citations.]" (*Graciano v. Mercury General Corp.* (2014) 231 Cal.App.4th 414, 425.) Although some cases have used the language of *failing* to accept a reasonable offer as akin to affirmatively *rejecting* the offer (e.g. *Reid v. Mercury Ins. Co.* (2013) 220 Cal.App.4th 262, 272-273), one recent appellate decision held that failure to accept a reasonable settlement offer is not per se unreasonable, as a failure to accept could be without fault. (*Pinto v. Farmers Insurance Exchange* (2021) 61 Cal.App.5th 676, 688, review denied June 23, 2021 (S268253).)[11] To be liable for bad faith, the insurer must act or fail to act without proper cause. (*Ibid.*)

---

efforts actually to settle the claim against its insured, when the claimant proposed a modification to its release. (*Id.* at p. 521.)

[11] On appeal, plaintiffs argue that *Pinto* was wrongly decided. While this appeal was pending, the Supreme Court denied review in *Pinto.* Plaintiffs also asked us to take judicial notice of the petition for rehearing in *Pinto* (which the Court of Appeal denied) and some excerpts from the trial court record in *Pinto* supporting the petition for rehearing. We find *Pinto* has no particular relevance to the issues as we have framed them, and see no reason to review the merits of the denial of the petition for rehearing. Accordingly, we deny the request for judicial notice.

2. ***There Was No Bad Faith as a Matter of Law***

    **A.    In Some Instances Lack of Bad Faith May Be Determined as a Matter of Law**

While bad faith is usually a question of fact, it can be one of law when facts are undisputed. (*Walbrook Ins. Co. v. Liberty Mut. Ins. Co.* (1992) 5 Cal.App.4th 1445, 1457.)

For example, lack of bad faith was resolved as a matter of law in *Reid v. Mercury Ins. Co., supra,* 220 Cal.App.4th 262. There, although the injured claimant contacted the insurer, the claimant never actually made a settlement demand or offer. Once the claimant retained counsel, counsel sent a letter, on July 28, 2007, confirming representation, stating that the claimant had been horribly injured, and seeking disclosure of the whereabouts of the insured's vehicle, the policy limits, and whether the insured was covered by an umbrella policy. Further letters were exchanged, but no settlement demand was made. The claimant then sued the insured. While that action was pending, the insurer offered a policy limits settlement, which the claimant rejected. When the claimant sued the insurer on an assigned bad faith claim, the insurer obtained summary judgment on the basis that it had no duty to initiate settlement negotiations because it was undisputed that there had been no settlement demand. (*Id.* at pp. 265-269.) On appeal, our colleagues in Division Eight of this court affirmed, concluding there was no bad faith as a matter of law, because there is no duty to initiate settlement discussions absent any indication from the injured claimant that he or she is inclined to settle within policy limits. (*Id.* at p. 273.) Of particular significance to the issue before us, the court interpreted the claimant's letters as a matter of law, stating, "[Claimant's son] asked for disclosure of policy limits, and defendant disclosed those limits four weeks

later, after it obtained the necessary permission from the insured to do so.  We will not construe a bare request to know the policy limit as an opportunity to settle.  Nor could any reasonable juror construe [claimant's counsel's] July 28, 2007 letter as 'an initiation of settlement' or a settlement opportunity." (*Id.* at pp. 277-278.)

*Graciano v. Mercury General Corp., supra,* 231 Cal.App.4th at page 418 resolved lack of bad faith as a matter of law, following a jury verdict in favor of the claimant.  There, the insurer had offered the injured claimant a policy limits settlement within the time demanded by the claimant; the claimant nonetheless asserted the insurer committed bad faith by failing to discover the facts and make its policy limits offer sooner.  The case proceeded to trial and resulted in a verdict in favor of the claimant on the insured's assigned bad faith claim. On appeal, the insurer argued there was insufficient evidence to support the verdict, and Division One of the Fourth Appellate District agreed, concluding there was no bad faith.  The insurer had made a policy limits offer before the claimant's deadline expired, thereby establishing good faith as a matter of law.  (*Id.* at pp. 422, 434-435.)

B.    **The Record Establishes There Was No Bad Faith As A Matter of Law**

Here, whether plaintiffs could pursue a bad faith claim turns on whether Attorney Parman's October 31, 2012 letter could be accepted with words only, or if instead it required delivery of Ganuelas's declaration by November 8 in order to be properly accepted.

We turn to the language of the letter.  (*Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 499-500 [when parol evidence is not conflicting, construction of an instrument is

24

a question of law and the appellate court will independently construe the writing].)  We repeat the relevant language, italicizing the critical terms:

"We are therefore, requesting settlement in the amount of your insured's policy limits and disclosure of your insured's policy limits.  *This settlement offer is conditional upon*:

"1.  Your furnishing us with a certified copy of the complete insurance policy, including declarations.

"2.  A prompt exchange of the settlement draft upon approval of the Petition to Approve Compromise of Disputed Claim for a Person with Disability for a fully executed release and settlement documents releasing your insured, driver, company and their respective agents, assigns, successors, affiliates, associates, heirs, executors, administrators and no other persons and parties.

"3.  Settlement draft is to be issued according to the court approved Settlement of a Person with Disability.

"4.  *A declaration signed by your insured regarding additional insurance coverage and agency*.

" . . .

"*We have enclosed herewith or have already supplied you with copies of billing statements and information necessary for evaluating this claim.  We, therefore, believe that you are in a position to act promptly upon this demand.  Accordingly, this offer shall remain open until 5:00 p.m. on* **November 8, 2012**."

The offer clearly states that it is "conditional upon" four items, including the paragraph about the declaration.  Requiring performance of each item by November 8, 2012 was not humanly possible.  It was undisputed that two of the conditions could not have been accomplished prior to November 8.  Attorney Parman agreed that it would not have been possible to obtain court

approval of the settlement by November 8.  She conceded that, based on her knowledge of the probate court's calendar, it would take 30 to 60 days after the petition was filed to have the matter heard.  Two of the conditions required court approval – exchanging a settlement draft approved by the probate court for a release, and issuing the draft in accordance with the court-approved settlement.  Neither could be performed prior to November 8.[12]

Plaintiffs nonetheless believe that AAA was required to comply with the fourth condition, alone, by November 8 in order for acceptance to be effective.  Preliminarily, we observe that while the first condition speaks of a certified copy of the policy being "furnished," the second condition of the settlement draft being "prompt[ly] exchange[d]," and the third condition of the settlement draft being "issued," the fourth condition required only that the declaration be "signed."  It contains no words of delivery.

Perhaps more fundamentally, when the letter speaks in terms of the deadline, and explains why Attorney Parman believed that AAA was "in a position to act promptly upon this demand," the letter mentions only the previous provision of "billing statements and information necessary for evaluating this claim."  The letter stated that, having already provided that information, "[w]e, therefore, believe that you are in a position to

---

[12]     The first condition, furnishing a certified copy of the policy, had already been performed.  Attorney Parman conceded that Velasco had previously sent a certified copy of the policy to Attorney Streeter, but she asked for it again because she likes to do her "own due diligence."  Her due diligence notwithstanding, the fact remained that the first condition had already been satisfied.

act promptly upon this demand." The "therefore" relates to the provision of information "necessary for evaluating the claim." There is no suggestion in the letter that Attorney Parman also believed that AAA was in a position to promptly supply the declaration.[13] The only reasonable interpretation of the deadline is that by November 8, 2012, AAA must formally agree to the policy limits settlement and agree that it will perform the remaining conditions within a reasonable time period.

We sum up: the letter offers a policy limits settlement with a very short deadline for acceptance and "conditioned" on four things; at least two of the conditions could not be performed by the deadline; the key, fourth, condition does not expressly require delivery of the document; and the letter represents its deadline is reasonable for reasons unrelated to compliance with any of the conditions. The language cannot reasonably be interpreted as requiring delivery of the declaration by November 8 for acceptance to be effective. We conclude as a matter of law that Velasco's written and oral communications of November 6, 2012, constituted timely acceptance of the offer.[14]

---

[13] Attorney Parman could have easily included in her letter that, due to the history of the claims process and in light of Attorney Streeter's prior requests, she required receipt of Ganuelas's executed declaration by November 8 or any other date certain. She did not do so.

[14] On appeal, plaintiffs suggest Velasco's letter was not sufficient acceptance as it was an unconditional policy limits offer which did not specifically mention agreement with Attorney Parman's conditions. But Velasco testified that his voice mail message accepted all the conditions, and Attorney Parman – who could not recall whether she had or had not received such a voice mail – could not disagree.

In their briefs, plaintiffs suggest that Attorney Parman's letter must be interpreted in the context of the claims-handling process to that point. We do not believe the history of the claims-handling process can affect the clear meaning of this unambiguous demand letter. Nonetheless, we observe that plaintiffs' view of the claims-handling process is contradicted by the undisputed evidence. Plaintiffs argue that AAA had been promising a declaration for months, and that Attorney Parman clearly needed performance, not another promise. Plaintiffs would construe the claims handling process as 10 months of Velasco failing to obtain a declaration; and that "AAA failed even to *try* to get Ganuelas's declaration until 11/21/2012." Plaintiffs' assertion that AAA failed to try to obtain a signed declaration until November 21 is belied by the fact that Attorney Parman had Attorney Okusanya's letter of October 24 that (1) conveyed all of the information necessary for the declaration, and (2) requested the final draft for Ganuelas to endorse.

We conclude that as a matter of law, the October 31 letter did not require AAA to provide Marin the declaration in order to effect acceptance. As such AAA could, and did, convey its acceptance by letter and voice mail message.

### DISPOSITION

The judgment is affirmed. Plaintiffs shall pay AAA's costs on appeal.


RUBIN, P. J.

WE CONCUR:



BAKER, J.                                    KIM, J.

28